Slip Op. 17-100

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TRI UNION FROZEN PRODUCTS, INC. ET AL., | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| v. | |
| UNITED STATES, | Before: Claire R. Kelly, Judge |
| **Defendant,** | Consol. Court No. 14-00249 |
| and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | |
| **Defendant-Intervenor.** | |

## <u>OPINION</u>

[Sustaining the final results of redetermination, pursuant to court remand, in the eighth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam.]

Dated: August 8, 2017

<u>Robert George Gosselink</u>, <u>Jarrod Mark Goldfeder</u>, and <u>Jonathan Michael Freed</u>, Trade Pacific, PLLC, of Washington, DC, for Plaintiffs Tri Union Frozen Products, Inc., Mazzetta Company LLC, and Ore-Cal Corporation, and for Consolidated Plaintiff Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd.

<u>William Henry Barringer</u>, <u>Matthew Paul McCullough</u>, and <u>Matthew Robert Nicely</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Consolidated Plaintiffs Vietnam Association of Seafood Exporters and Producers and certain of its individual member companies.

<u>Nathaniel Jude Maandig Rickard</u> and <u>Roop Kiran Bhatti</u>, Picard, Kentz & Rowe, LLP, of Washington, DC, for Consolidated Plaintiff and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

<u>Kara Marie Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of Counsel on the brief was <u>James H. Ahrens II</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Commerce") second remand determination filed pursuant to the court's order in <u>Tri Union Frozen Products, Inc. et al.  v. United States</u>, 41 CIT __, __, 227 F. Supp. 3d 1387, 1402 (2017) ("<u>Tri Union II</u>").  <u>See</u> Final Results of Redetermination Pursuant to Court Remand, July 26, 2017, ECF No. 144-1 ("Second Remand Results").

In <u>Tri Union II</u> the court remanded to Commerce the first remand determination in the eighth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam") for further explanation and consideration of the surrogate data selected to value the labor factor of production ("FOP") in this review.  <u>Tri Union II</u>, 41 CIT at __, 227 F. Supp. 3d at 1402. Specifically, the court remanded for Commerce to: (1) articulate a reasonable method by which a petitioner can demonstrate aberration or unreliability where, as here, there is a claim of widespread, systemic labor abuse, and (2) address the record evidence of widespread labor abuses in the Bangladeshi shrimp industry that undermines Commerce's implicit findings that the data from the Bangladesh Bureau of Statistics ("BBS data") is non-aberrational, reliable, and thus the best information available.  <u>See</u> <u>id.</u>  The court further ordered Commerce to explain why the Bangladeshi wage rate data is reliable and not aberrational despite the record data or, if the data is found to be aberrational and

unreliable, to either explain or reconsider the determination that the Bangladeshi labor

wage rate data is the best available information.  See id.

For the reasons that follow, Commerce's Second Remand Results comply with the

court's order in Tri Union II and accordingly are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the

previous two opinions ordering remand to Commerce, see Tri Union Frozen Products,

Inc. et al. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1263–66 (2016) ("Tri

Union I"); Tri Union II, 41 CIT at __, 227 F. Supp. 3d at 1390–93, and here recounts the

facts relevant to the court's review of the Second Remand Results.

In the final determination of this administrative review, Commerce selected

Bangladesh as the primary surrogate country for valuing respondents' factors of

production.  See Certain Frozen Warmwater Shrimp from the Socialist Republic of

Vietnam: Issues and Decision Memorandum for the Final Results, A-552-802, 9–17,

(Sept. 19, 2014), ECF No. 27-4 ("Final Decision Memo").  Over objections from Ad Hoc

Shrimp Trade Action Committee ("Ad Hoc Shrimp"), Commerce also selected labor wage

rate data from the Bangladeshi shrimp industry to value the labor factor of production.  Id.

at 47–48.  Commerce determined that the BBS data was the best available information

on the record to value labor in this review, stating that its finding is in keeping with its

practice to use "industry-specific labor rates from the primary surrogate country."  Id. at

47.  Commerce explained that it was unable to use data from its preferred source, ILO

Chapter 6A,  as Bangladesh does not report data to the ILO; therefore, Commerce used

data published by the BBS to value the labor factor of production.  Id. at 47–48.

Plaintiffs Tri Union Frozen Products, Inc., Mazzetta Company LLC, Ore-Cal

Corporation, Consolidated Plaintiff Quoc Viet Seaproducts Processing Trading and

Import-Export Co., Consolidated Plaintiffs Vietnam Association of Seafood Exporters and

Producers (including certain of its individual member companies), and Consolidated

Plaintiff Ad Hoc Shrimp respectively moved for judgment on the agency record

challenging various aspects of Commerce's final determination.  See Mem. Supp. Mot.

Tri Union Frozen Products, Inc. J. Agency R., Mar. 30, 2015, ECF No. 48; Mem. Supp.

Mot. Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd. J. Agency

R., Mar. 30, 2015, ECF No. 46; Resp't Pls. VASEP and Individual VASEP Members' Br.

Supp. Mot. J. Agency R., Mar. 30, 2015, ECF No. 50; Mot. Ad Hoc Shrimp Trade Action

Committee for J. Agency R. Under USCIT Rule 56.2, Mar. 30, 2015, ECF No. 49-3 ("Ad

Hoc Shrimp Br.").[1]  Ad Hoc Shrimp challenged as unsupported by substantial evidence

Commerce's use of the BBS data to value the labor factor of production in this review,

arguing that the BBS data is aberrational and unreliable and renders the final results of

the review unsupported by substantial evidence.  Ad Hoc Shrimp Br. 15–30.  Additionally,

Ad Hoc Shrimp argued that Commerce failed to explain why the BBS data was reliable

---

[1] The challenges raised by Plaintiffs Tri Union Frozen Products, Inc., Mazzetta Company LLC, Ore-Cal Corporation, Consolidated Plaintiff Quoc Viet Seaproducts Processing Trading and Import-Export Co., and Consolidated Plaintiffs Vietnam Association of Seafood Exporters and Producers (including certain of its individual member companies) to Commerce's final determination were rejected in Tri Union I; the court sustained Commerce's final determination with regard to those issues.  See Tri Union I, 40 CIT at __, 163 F. Supp. 3d at 1256, 1267–1312, 1313.

and non-distortive.  See id. at 23–24.  In response, Defendant requested remand for

Commerce to consider Ad Hoc Shrimp's arguments that the BBS wage rate data is

aberrational.  See Def.'s Resp. in Opp'n to Pls.' Mots. J. Agency R. 88–89, Sept. 10, 2015,

ECF No. 73.

In Tri Union I the court sustained Commerce's final determination in all respects

other than Commerce's use of the BBS data to value the labor factor of production.  Tri

Union I, 40 CIT at __, 163 F. Supp. 3d at 1313.  The court granted Defendant's request

to remand "for Commerce to reconsider Ad Hoc Shrimp's arguments concerning

Commerce's reliance on Bangladeshi labor wage rate data" from the BBS, to value the

labor factor of production in this review.  Id.

On first remand, Commerce continued to rely on the BBS data to value the labor

FOP, providing further explanation of its decision to do so in light of Ad Hoc Shrimp's

arguments that the Bangladeshi wage rate data is aberrational and unreliable due to

systemic labor abuses in the Bangladeshi shrimp industry.  See Final Results of

Redetermination Pursuant to Court Remand 5–42, Sept. 1, 2016, ECF No. 118-1 ("First

Remand Results").  Commerce continued to find that the BBS data provided the best

available information for valuing the labor FOP as it reflects the agency's "strong

preference to use surrogate values from the primary surrogate country," is specific to the

shrimp industry, and, while not contemporaneous, is closer to the period of review than

other data on the record.  Id. at 8–10.  Commerce also contended that Ad Hoc Shrimp

did not demonstrate the data to be aberrational and unreliable because Ad Hoc Shrimp

did not provide a "measurable means (i.e., a benchmark)" by which to assess the data as

distortive.  Id. at 29.  Commerce further emphasized that its statutory directive does not require it to consider socio-political factors that may influence industry wage rates.  See id. at 17.

Ad Hoc Shrimp challenged Commerce's continued reliance on the BBS data in the First Remand Results, again contending that the data is aberrational, unreliable, and therefore not the best available information with which to value the labor FOP.  See Consolidated Pl. Ad Hoc Shrimp Trade Action Committee's Comments on Final Results of Redetermination to Court Remand 6–30, Dec. 2, 2016, ECF No. 125.  Ad Hoc Shrimp argued that Commerce failed to adequately explain why, in light of the record evidence of widespread labor abuse within the Bangladeshi shrimp industry, the BBS data is reliable and non-aberrational.  See id.

In  Tri Union II  the court remanded the First Remand Results for further consideration of Ad Hoc Shrimp's argument that record evidence of alleged labor abuses in the Bangladeshi shrimp industry renders the BBS data aberrational, unreliable, and not reflective of actual labor conditions in a market economy at comparable economic development to the Socialist Republic of Vietnam.  Tri Union II, 41 CIT at __, 227 F. Supp. 3d at 1402.  Specifically, the court remanded for Commerce to: (1) articulate a reasonable method by which a petitioner can demonstrate aberration or unreliability where, as here, there is a claim of widespread, systemic labor abuse; and (2) address the record evidence of widespread labor abuses in the Bangladeshi shrimp industry that undermines Commerce's implicit findings that the data from the BBS data is non-aberrational, reliable, and thus the best information available.  See id.  The court further ordered Commerce to

explain why the Bangladeshi wage rate data is reliable and not aberrational despite the record data or, if the data is found to be aberrational and unreliable, to either explain or reconsider the determination that the Bangladeshi labor wage rate data is the best available information.  See id.

Commerce filed the Second Remand Results on July 26, 2017.  Commerce reconsidered its requirement of a quantitative analysis for evaluating a claim of aberrational labor data, concluding that a quantitative analysis is not reasonable where, as here, the petitioner has presented evidence of systemic labor abuse.  See Second Remand Results at 9–10.  Commerce explained that, because "wages among economically comparable countries and across industries often vary considerably," it determined that "a quantitative comparison of wage rates between countries, or within a single country, does little to address whether or not a labor value is 'aberrational.'"  Id. at 10.  Commerce concluded that "the petitioner cannot reasonably be expected to 'demonstrate quantitatively' that potential surrogate labor values are aberrational when its claims stem from systematic labor abuses."  Id. at 9–10.  Commerce determined that, in light of the record here and the alternate data available, the Bangladeshi wage rate data does not constitute the best available information for valuing the labor factor of production in this review, id. at 11, ultimately selecting the Indian wage rate data from the ILO on the record instead.  Id. at 12–13.

Following publication of the Second Remand Results, Ad Hoc Shrimp filed comments in support of the remand determination.  See Consolidated Pl. Ad Hoc Shrimp Trade Action Committee's Comments on Remand Results, July 26, 2017, ECF No. 145.

Ad Hoc Shrimp stated its position that "the legal deficiencies of the Final Results of [the eighth administrative review] have been addressed" and requested that the court sustain the Second Remand Results.  Id. at 2.  Ad Hoc Shrimp further noted that, because it was "the only party to have exhausted administrative remedies before the agency below," the "case should be considered as submitted for decision."  Id.  Defendant also filed comments requesting that the court sustain the Second Remand Results, as Commerce complied with the court's order in Tri Union II and no parties challenge the Second Remand Results.  See Def.'s Resp. Pl.'s Comments on Remand Results, July 28, 2017, ECF No. 146.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[2] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

## DISCUSSION

To determine normal value for subject merchandise exported from a nonmarket economy country,[3] Commerce uses surrogate values for the FOPs "based on the best available information[4] regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."[5]  19 U.S.C. § 1677b(c)(1); <u>see</u> 19 C.F.R. §§ 351.408(a)–(c) (2014).[6]  Commerce determines what data constitutes the best available information using criteria developed through practice.[7] <u>Qingdao Sea–Line Trading Co. v. United States</u>, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

---

[3] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).

[4] As "best available information" is not statutorily defined, Commerce has discretion to determine what data constitutes the best available information in a given case and to value the FOPs accordingly.  <u>See</u> <u>QVD Food Co. v. United States</u>, 658 F.3d 1318, 1323 (Fed. Cir. 2011); <u>Nation Ford Chemical Co. v. United States</u>, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce has considerable discretion in choosing the surrogate values that most accurately reflect the price that the NME producer would have paid had it purchased the FOP from a market economy country).  This discretion is broad but is not unlimited; "the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible."  <u>Shakeproof Assembly Components v. United States</u>, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

[5] Commerce selects for each FOP a surrogate value from a market economy country that is economically comparable to the NME country and a significant producer of the merchandise in question.  19 U.S.C. §§ 1677b(c)(4)(A)–(B); 19 C.F.R. § 351.408(b) (2014).

[6] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition.

[7] To determine what constitutes the best available information, Commerce evaluates the quality and reliability of data sources from the countries offered to value respondents' FOPs favoring data that is: (1) specific to the input in question; (2) representative of a broad market average of prices; (3) net of taxes and import duties; (4) contemporaneous with the period of review; and (5) publicly available.  <u>See</u> Import Admin., U.S. Dep't Commerce, <u>Non-Market Economy Surrogate Country Selection Process</u>, Policy Bulletin 04.1 (2004), <u>available at</u> http://ia.ita.doc.gov/policy/bull04-1.html (last visited Aug. 7, 2017); <u>see also</u> <u>Qingdao Sea–Line Trading Co. v. United States</u>, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

Commerce has a regulatory preference to value all FOPs using data from a single surrogate country, 19 C.F.R. § 351.408(c)(2), and its current practice is to value labor using industry-specific data from the primary surrogate country, as published in Chapter 6A of the ILO Yearbook of Labor Statistics.  Antidumping Methodologies in Proceedings Involving Non Market Economies: Valuing the Factor of Production, Labor, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce Jun. 21, 2011); see Final Decision Memo at 47.  Where ILO rates are not available, Commerce's preference is to use industry-specific labor wage rate data from the primary surrogate country.  See Final Decision Memo at 47.

Commerce has acknowledged that aberrational values should not be used to value FOPs.  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).  Where there is evidence that data is aberrational, Commerce must address that evidence in order to demonstrate that the data is nonetheless the best information available.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Commerce's usual practice for determining whether data is aberrational is to require a quantitative analysis, comparing either data from economically comparable countries or historical data from the country at issue to determine if the data is unreliable or an outlier.  See Second Remand Results at 9.

In Tri Union II the court determined that, on first remand, Commerce had not addressed Ad Hoc Shrimp's evidence of alleged systemic labor abuses and thus had not reasonably found the BBS labor data to be the best available information on the record.  See Tri Union II, 41 CIT at __, 227 F. Supp. 3d at 1396–1402.  The court remanded to

Commerce to clarify or reconsider its determination.  Id., 41 CIT at __, 227 F. Supp. 3d at 1402.

On second remand, Commerce has complied with the court's order.  Commerce reconsidered its methodology for determining whether labor data is aberrational, with special attention to how to determine aberration in circumstances of alleged widespread, systemic labor abuse.  See Second Remand Results at 7–11.  Commerce concluded that, due to the distinct nature of the labor FOP, a quantitative analysis for assessing whether prospective surrogate labor values are aberrational is not reasonable.[8]  Id. at 9–10.  Thus, Commerce concluded that, due to the distinct nature of the labor FOP, its "normal practice of determining if a surrogate value is 'aberrational' using a quantitative analysis cannot, and does not, provide a path by which the petitioner can demonstrate that the Bangladeshi wage rate data are aberrational, given its claim of systemic labor abuses."[9]  Id. at 11.

Commerce subsequently reconsidered its determination that the Bangladeshi BBS data constitutes the best available information:

> Although the Department's practice with respect to claims of aberration does not enable the petitioner to demonstrate quantitatively that the Bangladeshi data are aberrational in light of its claim, we acknowledge that additional considerations may affect a determination as to whether potential surrogate value data constitute the best available information. Given the

---

[8] Commerce determined that "a quantitative comparison of wage rates between countries, or within a single country, does little to address whether a labor value is 'aberrational,' as wages among economically comparable countries and across industries often vary considerably." Second Remand Results at 10.  Commerce likewise determined that "the petitioner cannot reasonably be expected to 'demonstrate quantitatively' that potential surrogate labor values are aberrational when its claims stem from systematic labor abuses."  Id. at 9–10.

[9] Commerce did not indicate how a petitioner could demonstrate labor wage rate data to be aberrational when there is a claim of systemic labor abuses.

> Court's concerns with respect to the evidence of labor abuses in Bangladesh provided by the petitioner, and given that there is no affirmative evidence of systematic labor abuses specific to the shrimp processing industries in certain other potential surrogate countries on the record, we have elected to conclude that the Bangladeshi wage rate is not the best available information on the record with which to value the respondents' labor FOPs.

Id. at 11.   Commerce concluded that, notwithstanding the primary surrogate country selection of Bangladesh, the Indian wage rate data on the record constituted the best available information to value the labor FOP in this review.  See id. at 12–14.

Commerce has complied with the court's order.  No party challenges Commerce's Second Remand Results, and the Second Remand Results are sustained.

## CONCLUSION

In accordance with the foregoing, Commerce's final determination on second remand complies with the court's order and is sustained.  Judgment will enter accordingly.


 /s/ Claire R. Kelly  
Claire R. Kelly, Judge


Dated: August 8, 2017  
New York, New York